**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen, Esq.
One Gateway Center, Suite 2600
Newark, NJ 07102
Telephone: (973) 313-1887
Fax: (973) 833-0399
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| CHRISTOPHER JONES, Individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>POET TECHNOLOGIES INC., SURESH VENKATESAN, and THOMAS MIKA,<br><br>Defendants. | Case No:<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>JURY TRIAL DEMANDED |

Plaintiff Christopher Jones ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, among other things, the investigation conducted by and through Plaintiff's attorneys, which included, among other things,

1

a review of the Defendants' public documents, public filings, wire and press releases published by and regarding POET Technologies Inc. ("POET", or the "Company"), and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. [1]

## NATURE OF THE ACTION

1.      This is a class action on behalf of persons or entities who purchased or otherwise acquired publicly traded POET securities between April 1, 2026 and 08:57 AM ET on April 27, 2026, inclusive (the "Class Period"). Plaintiff seeks to recover compensable damages caused by Defendant's violations of the federal securities laws under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

3.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

---

[1] Unless otherwise stated, all emphasis is added and internal citations are omitted.

2

4. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as the alleged misstatements entered and the subsequent damages took place in this judicial district.

5. In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

6. Plaintiff, as set forth in the accompanying certification, incorporated by reference herein, purchased POET securities during the Class Period and was economically damaged thereby.

7. Defendant POET is incorporated under the laws of the Province of Ontario, in Canada, and its principal executive offices are located at 1107 – 120 Eglinton Avenue East, Toronto, Ontario, M4P 1E2, Canada. The Company's common stock trades on the Nasdaq Capital Market (the "NASDAQ") under the ticker symbol "POET".

8. Defendant POET has a subsidiary in this judicial district.

9. Defendant POET describes itself as follows:

3

[POET] is a design and development company offering photonic integrated packaging solutions based on the POET Optical Interposer™, a novel platform that allows the seamless integration of electronic and photonic devices onto a single chip using advanced wafer-level semiconductor manufacturing techniques. The semiconductor industry has adopted the term "Wafer-Level Chip-Scale Packaging" (or "WLCSP") to describe similar approaches within the semiconductor industry. POET's Optical Interposer eliminates costly components and labor-intensive assembly, alignment, and testing methods employed in conventional photonics. We believe the cost-efficient integration scheme and scalability of the POET Optical Interposer brings value to devices or systems that integrate electronics and photonics, including high-growth areas of communications and computing. The emergence of Artificial Intelligence (AI) systems over the past few years has placed extraordinary demands on cloud-based AI service providers and hyperscale data centers for increases in network speeds and bandwidth and decreases in latency. We believe that chip-scale integration is essential to developing hardware that can meet such demands and that POET is on the forefront of providing scalable solutions for current and future AI systems.

10.   Defendant Suresh Venkatesan ("Venkatesan") served as the Company's Chief Executive Officer ("CEO") at all relevant times.

11.   Defendant Thomas Mika ("Mika") served as the Company's Executive Vice President and Chief Financial Officer at all relevant times.

12.   Defendants Venkatesan and Mika are collectively referred to herein as the "Individual Defendants."

13.   Each of the Individual Defendants:

(a)   directly participated in the management of the Company;

(b)   was directly involved in the day-to-day operations of the Company at the highest levels;

4

(c)     was privy to confidential proprietary information concerning the Company and its business and operations;

(d)     was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e)     was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f)     was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g)     approved or ratified these statements in violation of the federal securities laws.

14.     POET is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

15.     The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to the Company under *respondeat superior* and agency principles.

5

16.     POET and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS
### Materially False and Misleading Statements
### Issued During the Class Period

17.     On March 31, 2026, after the market closed, POET filed with the SEC its annual report on Form 20-F for the year ended December 31, 2025 (the "2025 Annual Report"). Attached to the 2025 Annual Report were certifications pursuant to the Sarbanes Oxley Act of 2002 ("SOX") signed by Defendants Venkatesan and Mike attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

18.     The 2025 Annual Report contained the following risk disclosure under the heading "The Company may be classified as a passive foreign investment company for U.S. federal income tax purposes for the year ended December 31, 2025 and for the current and future years, which could result in adverse U.S. federal income tax consequences to U.S. holders of our common shares":

We would be classified as a passive foreign investment company ("PFIC") for any taxable year if, after the application of certain look-through rules with respect to the income and assets of our corporate subsidiaries in which we own at least 25% (by value) of the stock, either: (i) 75% or more of our gross income for such year is "passive income" (as defined in the relevant provisions of the Internal Revenue Code of 1986, as amended (the "Code")), or (ii) 50% or more of the value of our assets (generally determined on the

basis of a quarterly average) during such year is attributable to assets that produce or are held for the production of passive income. Based on our income and assets for the year ended December 31, 2025, *we believe that we may be treated as a PFIC for the preceding taxable year*. Whether we will be treated as a PFIC for U.S. federal income tax purposes for the current taxable year or any future taxable year is a factual determination that must be made annually after the close of each taxable year and is dependent on many factors, including the value of our passive assets, the amount and type of our gross income and market capitalization. *Therefore, there can be no assurance that we will not be classified as a PFIC for the current or future taxable years*. Certain adverse U.S. federal income tax consequences could apply to a U.S. Holder (as defined below in Item 10.E. "Taxation" – U.S. Federal Income Tax Considerations") if we are treated as a PFIC for any taxable year during which a U.S. Holder holds our common shares. *See* discussion in Item 10.E. "Taxation" – U.S. Federal Income Tax Considerations - Passive Foreign Investment Company Status."

19. The statement in ¶ 18 was materially false and misleading at the time it was made because it materially understated the likelihood that POET would be deemed a passive foreign investment company or "PFIC." In addition, it was materially false and misleading when made because it did not warn investors that if the Company was deemed a PFIC by the IRS, that that could result in material harm to the Company's valuation, as a result of investors not wishing to put resources and time into onerous tax requirements brought on by investing in POET, thus reducing demand for POET stock.

20. On April 21, 2026, after the issuance of Wolfpack's Report (as discussed below), Defendant Mika appeared in an interview published by Stocktwits on Youtube.com entitled "POET Technologies CFO Responds to Wolfpack Short Report + War Chest Strategy | $POET."

21.     Defendant Mika made the following statement (transcribed from the video) in the interview with Stocktwits, in the following exchange:

**Interviewer**: *Are you in an NDA with a hyperscaler right now?*

**Defendant Mika**: *Umm, we're in NDAs with uh suppliers to hyperscalers.*

**Interviewer**: Ok, ok. *And then what do you make of the Marvell comparison?* You know, where does POET sort of sit in the stack? Are you competing with them? Are you enabling them?

**Defendant Mika**: Well, we're not, I mean Marvell is is we're not trying to build, you know GPU devices, which I think is what their most recent announcement was about.

**Interviewer**: Yeah

**Defendant Mika**: *We're we're a supplier to Marvell now that they've acquired Celestial AI who has been a customer of ours for a couple of years*. And what we supply to uh Celestial AI are light sources, high bandwidth, multi-frequency, high power light sources that light up the photonic fabric that Celestial AI talks about as being the communication device between GPUs and one GPU and another GPU, a GPU and a memory device. So um you know we think that that uh light source market isn't really, and and what we have to offer in that light source market, isn't fully reflected in our market cap. I mean, we showed what we call the "blazar" back in uh OFC the optical fiber conference in San Francisco back in 2025. Nobody nobody got it. This time around in Los Angeles, we were visited by several um laser companies um who now understand that they need an approach to a laser development that's very similar to what ours is um . . and I'd be getting into some very deep technical details to try.

**Interviewer**: All right. Well, perhaps you won't be surprised, but the investors in our community are in the weeds on some of the technical details but um, I will close with a couple of their questions [. . .] *Um, this one comes from uh uh an investor [. . .] and he has a question for you – "Thomas, with Marvell's acquisition of Celestial AI, which you just mentioned, and the Envy Link Fusion partnership reshaping the CPO supply chain, what's the clearest near-term milestone investors should watch as evidence that*

*POET's optical interposer is moving from design wins into recognized revenue? What's a realistic time frame?*

**Defendant Mika**: *So, we have an invoice from Celestial AI, which we're intending to ship product against. Uhh and that'll be shipped this year. In fact, I believe some of it will be shipped next quarter. Um, so that life light source product is, is, the product that we're going to be selling to Marvell and to Celestial AI. Umm and, uh, I think that will umm you know, assist them in uhh in what they're doing internally to develop those uh [GPUs].*

22. The statements made by Defendant Mika in ¶ 21 were materially false and misleading at the time it was made because Defendant Mika falsely indicated he was not subject to an nondisclosure agreement ("NDA") with Marvell Semiconductor Inc. (which is a subsidiary of Marvell Technology, Inc., collectively "Marvell"), when in fact he was subject to an NDA. Further, Defendant Mika did not warn that, in making the statements, he was breaching a confidentiality agreement with Marvell which could result in termination of the deal, thus harming the Company's business prospects.

23. The statements contained in ¶¶ 18 and 21 were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) POET Technologies misrepresented its tax status due to it likely being deemed a passive foreign investment company (or "PFIC") under U.S. tax laws which, if not properly

9

reported by each U.S. stockholder, would have negative tax implications for those U.S. stockholders; (2) the foregoing tax issue would, if discovered, make POET Technologies a less attractive investment than it would otherwise be, thus threatening POET Technologies' valuation; (3) Defendant Thomas Mika, despite affirming that he was not violating a non-disclosure agreement, in fact violated a business agreement by speaking about POET Technologies' business agreements in a public interview, thus endangering POET Technologies' business prospects, and (4) as a result, Defendants' statements about POET Technologies' business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

## THE TRUTH BEGINS TO EMERGE

24.     On April 14, 2026, Wolfpack Research ("Wolfpack") issued a press release entitled "We Believe POET is A Obvious Stock Promote, Has Created An IRS Nightmare: US Holders Have Until April 15th To Act") (the "Report")

25.     In the Report, Wolfpack stated the following about POET, as background:

> POET has all the hallmarks of a classic stock promote. This Canadian company has pivoted from one hot topic to another in the last decade, raising money all-the-while none of them appear to have panned out. Remarkably, POET has made just $2.3 million in revenue since 2020. That's less than a grimy Pizza Hut—with a 2025 net loss of -5,858% of revenue. So clearly, selling goods or services is not as important as selling stock. From the end of 2022 to early 2026, the share count has gone from roughly 38 million to 153 million – a 303% increase in shares outstanding in just over three years. This

10

is their real business model. Not exhaustive, not infallible – but the trend is unmistakable.

26.     Wolfpack announced the following in the Report, including how POET is likely a PFIC:

We are short [POET] because the management for this obvious stock promotion, now on what appears to be its seventh business pivot this decade, is not just diluting US investors, but sticking them with a massive tax liability and a potential lifetime of misery with the IRS. ***POET set US investors on a collision course with the IRS by accumulating so much cash through dilution, and generating so little operating revenue that our analysis, corroborated by multiple experts, show they qualify as a Passive Foreign Investment Company—or a PFIC***. This has horrible compliance implications for US holders—not the company—with severe consequences for failure: investors who fail to make the timely proper elections must pay the highest marginal tax rate, plus a punitive and compounding interest rate. Those who comply and make an election must pay ordinary income tax rates on gains, **realized or unrealized**, every year.

(Bolding in original, emphasis added).

27.     The Report further stated, in part:

It sucks to fall for a stock promote, but usually you only lose money. But with a PFIC, you also get to deal with the IRS. One expert told us it was "obvious" POET was a PFIC. Drop their 20-F in Claude and ask, "is POET a PFIC?" The answer is yes. ***PFIC holders must timely file a special form every year and pay ordinary income tax rates, on realized and unrealized gains, gutting any incentive to hold for the long-term. Failing to file correctly results in IRS compliance hell, where you are paying punitive compounding interest and the highest possible marginal rates. Thanks to a provision tax lawyers call "once a PFIC, always a PFIC," this nightmare will follow you as long as you hold the stock***."

28.     On this news, POET stock fell $0.59 per share, or 8.08%, to close at $6.71 on April 14, 2026.

11

29.    On April 15, 2026, *one day* after Wolfpack's report, POET issued an announcement entitled "POET Technologies Provides Clarity on its Passive Foreign Investment Company (PFIC) Status". The announcement stated the following, effectively confirming Wolfpack's allegations about POET being a PFIC, which would make it an unattractive investment to many investors:

[POET] today announced that it will make available the information necessary for its U.S. shareholders to make a "QEF" election. ***If a U.S. shareholder timely makes such an election, it should mitigate certain potential adverse U.S. federal income tax consequences to it that could otherwise result from the Company's status as a passive foreign investment company (or "PFIC") for the year ended December 31, 2025***. Further, a U.S. shareholder that makes a QEF election with respect to POET for fiscal year 2025 is not expected to have current income inclusions for fiscal year 2025 as a result of the QEF election, and consequently, a QEF election with respect to such year is expected to result in no negative U.S. federal income tax consequences for U.S. shareholders that have continued to hold their POET shares.

30.    The announcement quoted Defendant Mika as stating the following:

As the Company looks to 2026, we believe that we will not qualify as a PFIC. ***Nevertheless, the Board of Directors has declared its intention to move the Company's headquarters to and redomicile the Company in the U.S. so that it will no longer be a foreign corporation, which would eliminate the possibility of the Company being classified as a PFIC in future years***.

31.    On April 27, 2026, before the market opened, at 08:58 AM, POET issued a press releases entitled "POET Technologies Provides Purchase Order Update." The announcement stated the following, revealing that Defendant Mika lied to the market and POET Technologies investors by falsely claiming that he was not subject to an NDA with Marvell when he was in fact subject to one:

12

[POET today announced] the cancellation of all purchase orders received by the Company from Celestial AI, including the ones for initial production units first disclosed (the "Purchase Orders") by the Company in a press release on April 25, 2023. ***Marvell Semiconductor Inc., which acquired Celestial AI, provided written notice of the cancellation to the Company on April 23, 2026. As the basis for the cancellation, Marvell indicated that the Company had made disclosures of information related to the Purchase Order and shipping information in contravention of its confidentiality obligations***.

32.     On this news, the price of POET stock fell $7.15 per share, or 47.3%, to close at $7.95 on April 27, 2026.

33.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common shares, Plaintiff and the other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

34.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than defendants who acquired POET securities publicly traded on the NASDAQ during the Class Period, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

35.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's securities were

actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds, if not thousands of members in the proposed Class.

36.   Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

37.   Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

38.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the Exchange Act was violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and financial condition of the Company;

14

- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

- whether the Defendants caused the Company to issue false and misleading filings during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false filings;

- whether the prices of the Company's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

39. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

15

40.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- the Company's securities met the requirements for listing, and were listed and actively traded on the NASDAQ, an efficient market;

- as a public issuer, the Company filed public reports;

- the Company communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases via major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

- the Company's securities were liquid and traded with moderate to heavy volume during the Class Period; and

- the Company was followed by a number of securities analysts employed by major brokerage firms who wrote reports that were widely distributed and publicly available.

41.    Based on the foregoing, the market for the Company securities promptly digested current information regarding the Company from all publicly available sources and reflected such information in the prices of the common units,

16

and Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

42.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information as detailed above.

## COUNT I
### For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder Against All Defendants

43.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

44.     This Count asserted against Defendants is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

45.     During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

17

46. Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;

- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

- engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of the Company's securities during the Class Period.

47. Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made

18

them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

48.    Individual Defendants, who are or were senior executives and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other Company's personnel to members of the investing public, including Plaintiff and the Class.

49.    As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of the Company's securities during the Class Period in purchasing the Company's securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

50.    Had Plaintiff and the other members of the Class been aware that the market price of the Company's securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information

19

which Defendants did not disclose, they would not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

51.    As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

52.    By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of the Company's securities during the Class Period.

## COUNT II
### Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

53.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

54.    During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information about the Company's business practices

55.    As officers of a public business, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public

20

statements issued by the Company which had become materially false or misleading.

56.    Because of their positions of control and authority as senior executives and/or directors, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period concerning the Company's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Company securities.

57.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiff, on behalf of himself and the Class, prays for judgment and relief as follows:

(a)    declaring this action to be a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of

the Federal Rules of Civil Procedure and designating plaintiff's counsel as Lead Counsel;

(b)    awarding damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, together with interest thereon;

(c)    awarding plaintiff and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    awarding plaintiff and other members of the Class such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.


Dated:        April 28, 2026        **THE ROSEN LAW FIRM, P.A.**
                                    /s/ Laurence M. Rosen, Esq.
                                    Laurence M. Rosen, Esq.
                                    One Gateway Center, Suite 2600
                                    Newark, NJ, 07102
                                    Tel: (973) 313-1887
                                    Fax: (973) 833-0399
                                    Email: lrosen@rosenlegal.com

                                    *Counsel for Plaintiff*

22